IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :          CRIMINAL ACTION
                              :
            v.                :
                              :
KENNETH EUGENE CHERRY, JR.    :          NO. 19−122−1

MEMORANDUM

Bartle, J.                                January 24, 2024

Before the court is the motion of Kenneth Eugene
Cherry, Jr., acting pro se, to vacate, set aside, or correct his
sentence under 28 U.S.C. § 2255.[1]

Cherry contends that the application of federal
firearms laws to him infringed on his right under the Second
Amendment pursuant to recent decisions of the Supreme Court and
the Court of Appeals for the Third Circuit.  Cherry further
argues that he received ineffective assistance of counsel in
violation of the Sixth Amendment.  Finally, Cherry maintains
that he was deprived of due process and subject to double
jeopardy in violation of the Fifth Amendment.

I.   Background

From January 2018 through February 2019, Cherry
participated in a firearms trafficking scheme in Philadelphia,

---

1.   Cherry was appointed counsel for the evidentiary hearing
regarding one of his ineffective assistance of counsel claims,
but has otherwise proceeded pro se.

Pennsylvania.  Of the forty-five firearms that Cherry sold to the Government's undercover informant, two firearms were classified as machineguns, three firearms were reported stolen, and seven firearms had obliterated serial numbers.  Cherry became aware that he was being investigated by law enforcement and went into hiding.  Federal agents tracked him down to a hotel in Springfield, Pennsylvania.  When agents attempted to arrest him, Cherry led them on a multi-block foot chase and sought refuge in a private residence without permission.  He was ultimately taken into custody and indicted by a grand jury on twenty-seven counts.

On August 27, 2019, following a jury trial, Cherry was found guilty of twenty-one firearms offenses: (a) one count of dealing in firearms without being licensed to do so in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D); (b) thirteen counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), (2); (c) one count of possession and transfer of a machinegun in violation of 18 U.S.C. § 922(o); (d) two counts of possession of an unregistered firearm in violation of 26 U.S.C. §§ 5845(a), 5861(d), and 5871; and (e) seven counts of possession of a firearm with the serial number removed, obliterated, or altered in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).  Cherry, as noted above, was charged with a total of twenty-seven counts.  He was found not

guilty of one count and the court granted the Government's
motion to dismiss five counts.

At Cherry's sentencing hearing, the court applied the
Sentencing Guidelines to the remaining twenty-one counts and
calculated a total offense level of thirty-three.  The court
further determined that Cherry's prior adult criminal
convictions amounted to nine criminal history points, placing
him in category four.  Thus, the advisory range under the
Sentencing Guidelines was 188 to 235 months of imprisonment.

Although the court took into account the advisory
range, it imposed Cherry's sentence based on various factors
listed in 18 U.S.C. § 3553(a).  The court emphasized the
seriousness of Cherry's offenses, the need to protect the public
from further crimes by him, and the desire to deter others from
engaging in similar criminal activity.  The total sentence
imposed was sufficient but not greater than necessary.

Cherry was sentenced to sixty months' imprisonment on
one count of dealing in firearms without a license and each of
the seven counts of possession of firearms with the serial
number obliterated.  See 18 U.S.C. §§ 922(a)(1)(A), (k), and
924(a)(1)(D).  The sentences on these eight counts were imposed
to run concurrently.  Additionally, Cherry was sentenced to one
hundred and twenty months' imprisonment on each of the ten
counts of possession of firearms by a felon, one count of

possession and transfer of a machinegun, and two counts of
possession of unregistered firearms.  See 18 U.S.C.
§§ 922(g)(1),(2), and (o); 26 U.S.C. §§ 5845(a), 5861(d), and
5871.  The court ordered the sentences on these thirteen counts
to run concurrently with each other but consecutively to the
sentences on the other eight counts.  Thus, the total time of
imprisonment was 180 months.  The court further imposed three
years of supervised release on each count, with all counts
running concurrently.

Cherry appealed the judgment.  The only issue on
appeal was Cherry's challenge to the fact that the court, for
scheduling reasons, allowed the testimony of the Government's
main fact witness to be interrupted several times by the
testimony of other witnesses.  U.S. v. Cherry, No. 21-1991, 2022
WL 1196989, at *2 (3d Cir. Apr. 22, 2022).  The Court of Appeals
affirmed the judgment.  Id.

Cherry timely filed the instant motion under 28 U.S.C.
§ 2255.  He thereafter moved for an evidentiary hearing.  The
court stayed proceedings pending the en banc decision by the
Court of Appeals for the Third Circuit in Range v. Att'y Gen. of
U.S., which was handed down on June 6, 2023.  69 F.4th 96 (3d
Cir. 2023).  In January 2024, the court held an evidentiary
hearing limited to Cherry's Sixth Amendment claim of ineffective
assistance of counsel as to what his trial counsel told him

regarding sentencing.  The court appointed Peter Thompson, Esq. to represent Cherry at the hearing.

## II.  Standard of Review

A motion under Section 2255 is a form of collateral attack identical in scope to federal habeas corpus.  See Davis v. United States, 417 U.S. 333, 343 (1974);  28 U.S.C. § 2255. If, while a defendant's 2255 motion is pending, the Supreme Court or Court of Appeals announces a new rule relevant to the defendant's motion, then the sentencing court must apply the new rule retroactively.  Griffith v. Kentucky, 479 U.S. 314, 322-23 (1987).  Here, as noted above, Cherry challenges his conviction on the grounds that his sentence violated the Second, Fifth, and Sixth Amendments of the Constitution.

## III. Second Amendment Analysis

Cherry first argues that his sentences for possession of firearms by a felon and possession of firearms with the serial numbers obliterated violated his Second Amendment right to keep and bear arms.  See 18 U.S.C. §§ 922(g)(1), (k).  Cherry does not argue that Sections 922(g)(1) and (k) are unconstitutional on their face but rather that they are unconstitutional as applied to him.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

infringed."  U.S. Const. amend. II.  The Second Amendment right
has been interpreted by the Supreme Court as the individual
right to keep and bear arms, irrespective of militia service.
District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen,
petitioners Brandon Koch and Robert Nash, both characterized as
law-abiding citizens, had applied for unrestricted licenses to
carry a handgun in public for general self-defense.  142 S. Ct.
2111, 2124-25 (2022).  However, New York granted petitioners
restricted licenses, permitting them to carry handguns outside
the home only for hunting and similar activities.  Id. at 2125.
Petitioners brought a civil action for declaratory and
injunctive relief under 42 U.S.C. § 1983.  Id.  They alleged
that their denial of an unrestricted license violated their
Second and Fourteenth Amendment rights.  Id.

The Supreme Court applied a two-part textualist and
historical test for determining whether a law violates the
Second Amendment:

> When the Second Amendment's plain text
> covers an individual's conduct, the
> Constitution presumptively protects that
> conduct.  The government must then justify
> its regulation by demonstrating that it is
> consistent with the Nation's historical
> tradition of firearm regulation.  Only then
> may a court conclude that the individual's
> conduct falls outside the Second Amendment's
> unqualified command.

142 S. Ct. at 2129-30 (emphasis added).  Since the State of New York could not demonstrate that its licensing law was consistent with "the Nation's historical tradition of firearm regulation," the Court held the law to be unconstitutional.

Our Court of Appeals, applying Bruen, faced a similar issue in Range.  69 F.4th at 96.  In 1995, petitioner Bryan Range pleaded guilty in a Pennsylvania state court to one count of making a false statement on his application for food stamps in violation of 62 Pa. Stat. Ann. § 481(a).  See id. at 98. Range was sentenced to three years' probation.  Id.  Although Range had no other criminal record, his request, decades later, to buy a deer-hunting rifle was rejected based on Pennsylvania's instant background check system.  Id. at 98-99.  Range learned that a federal law, 18 U.S.C. § 922(g)(1), permanently prohibited him from possessing firearms because his 1995 state conviction was punishable under Pennsylvania law by up to five years' imprisonment, and thus, he would qualify as a felon under federal law.  Id.  Range brought a civil suit in federal court for declaratory and injunctive relief.  Id. at 99.  Applying the textualist and historical approach of Bruen, the Court of Appeals directed the District Court to "enter a declaratory judgment in favor of Range [and] enjoin enforcement of [18 U.S.C.] § 922(g)(1) against him."  Id. at 106.

In accordance with Bruen and Range, the court must first determine whether the "Second Amendment applies to [Cherry] and his proposed conduct." See Range, 69 F.4th at 101. Range made clear that United States citizens, even those that are not "law-abiding," are considered one of "the people." See id. at 103; U.S. Const. amend. II. As to what is protected conduct, Bruen requires courts to apply the "plain text" reading of "to keep and bear Arms," which "guarantees the individual right to possess and carry weapons in case of confrontation." See 142 S. Ct. at 2134 (quoting Heller, 554 U.S. at 592) (emphasis added); U.S. Const. amend. II. For present purposes, the court assumes that Cherry has passed the first step, that is that he is one of "the people." See U.S. v. Kalief Ladson, No. CR 23-161-1, 2023 WL 6810095 at *5 (E.D. Pa. Oct. 16, 2023).

In the second step of Bruen and Range, the Government bears the burden of proving that the application of the challenged firearms regulation, that is Sections 922(g)(1) and (k), "is consistent with the Nation's historical tradition of firearms regulation." See Bruen, 142 S. Ct. at 2129-30; Range, 69 F.4th at 103 (quoting Bruen). The Supreme Court identified two approaches for properly assessing the Government's proffered historical reasoning. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," a court need only determine whether there is

a "distinctly similar historical regulation."  Bruen, 142 S. Ct. at 2132.  Second, when a challenged regulation implicates, "unprecedented societal concerns or dramatic technological change," a court must reason by analogy.  Id. at 2132.  The historical firearm regulation proffered by the Government must be "relevantly similar" to the challenged modern regulation. Id.  The court may consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  Id. at 2133.

Accordingly, Cherry's Second Amendment challenges turn on whether the Government has met its burden of demonstrating that Cherry's convictions under Sections 922(g)(1) and (k) were consistent with the "Nation's historical tradition of firearms regulation."  See Bruen, 142 S. Ct. at 2129-30.

A. Convictions Under Section 922(g)(1)

Section 922(g)(1) makes it "unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).  The term "crime punishable by imprisonment for a term exceeding one year" includes state offenses that are classified as felonies and state misdemeanors punishable by imprisonment of over two years.  See 18 U.S.C. § 921(a)(20)(B).  Accordingly, individuals convicted of state

-9-

felonies, as defined under federal law, are prohibited from possessing firearms by Section 922(g)(1).

Cherry incurred multiple adult convictions prior to those challenged in the instant motions.[2]  On May 29, 2008, Cherry falsely identified himself to police at a traffic stop. During the ensuing search of the vehicle, officers recovered twenty-two bags of cocaine and a semiautomatic handgun.  While in custody and awaiting trial, Cherry attempted to conceal a cellphone in his prison cell.  On October 2, 2009, Cherry pled guilty to possession with intent to deliver cocaine in violation of 35 Pa. Cons. Stat. § 780-113(A)(30), criminal conspiracy in violation of 18 Pa. Cons. Stat. § 903(A)(2), false identification to law enforcement in violation of 18 Pa. Cons. Stat. § 4914(A), and possession of contraband in violation of 18 Pa. Cons. Stat. § 5123(C)(2).

Under Pennsylvania law, possession with intent to deliver cocaine and criminal conspiracy are felonies, each punishable by a maximum of fifteen years' imprisonment. Possession of contraband is graded as a misdemeanor, but punishable by a maximum of two and one-half to five years' imprisonment.  Cherry was sentenced to three to six years'

---

2.  The court does not consider in its analysis here Cherry's many juvenile adjudications nor an adult conviction which he alleges was expunged.

imprisonment for the possession of cocaine, criminal conspiracy, and false identification offenses and three to twenty-three months' imprisonment for the contraband offense.

In sum, two of Cherry's prior convictions are graded as felonies in Pennsylvania and three are punishable by more than two years' imprisonment.  Thus, Cherry had three prior adult convictions uncontested here that qualify as felonies under federal law.  See 18 U.S.C. § 921(a)(20).  In the present case, Cherry was convicted of 10 counts of violating Section 922(g)(1), for which he was sentenced to 120 months imprisonment.

The Government contends that Section 922(g)(1) as applied to Cherry is analogous to historical regulations that disarmed dangerous or untrustworthy individuals.  In support, the Government sets forth the following historical analysis in its brief:

> In England, a 17th century statute empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom."  Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.  The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms.  Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms," 95 Notre Dame L. Rev. 397, 405 (2019).

Colonial and early state
legislatures likewise disarmed individuals
who "posed a potential danger" to others.
NRA v. Bureau of Alcohol, Tobacco, Firearms,
& Explosives, 700 F.3d 185, 200 (5th Cir.
2012).  Some early laws categorically
disarmed entire groups deemed dangerous or
untrustworthy, such as those who refused to
swear allegiance.  Id.; see, e.g., Act of
May 1, 1776, ch. 21, § 1, 1776 Mass. Acts
479;  Act of June 13, 1777, ch. 21, § 4,
1777 Pa. Laws 63;  Act of May 28, 1777, ch.
3 (Va.), reprinted in 9 William Waller
Hening, The Statutes at Large; Being a
Collection of all the Laws of Virginia from
the First Session of the Legislature, in the
Year 1619, at 281-83 (1821).  Other laws
called for case-by-case judgments about
dangerousness.  See, e.g., Act for
Constituting a Council of Safety, ch. 40,
§ 20, 1777 N.J. Laws 90 (empowering
officials to "take from such Persons as they
shall judge disaffected and dangerous to the
present Government, all the Arms,
Accoutrements and Ammunition which they own
or possess").  Still other laws disarmed
individuals who had demonstrated their
dangerousness by engaging in particular
types of conduct, such as carrying arms in a
manner that spreads fear or terror among the
people.  See, e.g., Act for the Punishing of
Criminal Offenders, 1692 Mass. Laws 11-12;
Act for the Punishing Criminal Offenders,
1696-1701 N.H. Laws 15.

The court has found these citations to be accurate.

Cherry references nothing to the contrary.[3]  The court agrees

---

3.    In a supplemental brief, Cherry contends that citizens
labeled felons were historically considered part of "the
people."  This court assumes that Cherry is one of the people
and thus moves to the second step in the analysis of Bruen and
Range.  Cherry further argues that "Prior to 1791, and even in
the early 1800 [sic], some Colonies and small communities had
ordinances that prohibited people from carrying firearms within

with the Government that Cherry's prior criminal record
demonstrated that he was the type of dangerous individual that
has been historically disarmed.  In particular, the court is
persuaded by Cherry's unchallenged conviction for possession
with intent to distribute cocaine, a dangerous and deadly
substance.  Furthermore, Cherry is a repeat offender, having
committed these prior felonies within a few years, including
while incarcerated.  Cherry's situation is dramatically
different from the circumstances in Bruen and Range.
Accordingly, the court finds that the Government has met its
burden of establishing that Section 922(g)(1) as applied to
Cherry is consistent with "the Nation's historical tradition of
firearm regulation."  See Bruen, 142 S. Ct. at 2129-30.

B. Convictions Under Section 922(k)

Section 922(k) makes it unlawful "for any person
knowingly to transport, ship, . . . possess or receive any
firearm which has had the importer's or manufacturer's serial
number removed, obliterated, or altered."  18 U.S.C. § 922(k).
Cherry was convicted of seven counts of possessing firearms with

---

the limits of those towns.  Those were local ordinances, not
state or federal laws . . . .  Thus, "the people" (our
Forefathers) to prevent such unlawful ordinances ratified the
Second Amendment . . . ."  Assuming that Cherry is correct,
these examples do not refute the government's proffered
historical tradition of disarming dangerous or untrustworthy
individuals.

obliterated serial numbers, for which he was sentenced to concurrent terms of sixty months' imprisonment.

The Government explains that Congress did not require serial numbers on all new and imported firearms until the Gun Control Act of 1968.  Through this requirement, Congress sought to eliminate the ability of consumers to mail-order firearms, the method by which Lee Harvey Oswald purchased the firearm used in the assassination of President John F. Kennedy.  Nash E. Gilmore, A Bridge over Troubled Water: The Second Amendment Guarantee for the Previously Mentally Institutionalized, 86 Miss. L.J. Supra 1, 14, fn. 62. (2017).  Gun purchases by mail order are a technological advancement not contemplated by the Founders in 1791.  Accordingly, the Government must identify a "relevantly similar" Founding-era regulation.  See Bruen, 142 S. Ct. at 2132.

The Government offers copious colonial and state laws regulating the trade of firearms and gunpowder through markings or licenses akin to modern serial numbers.  For example, a Massachusetts law in 1805 appointed "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them and mark conforming barrels in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured."  3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-60 (1807).

Furthermore, the Commonwealth made it unlawful for any person to "falsely forge or alter the stamp of any prover of firearms . . . impressed on any musket or pistol barrel." Id. at 261.  In 1821, Maine likewise required prover markings on firearm barrels and imposed steep fines on any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms."  1821 Me. Laws at 546.

Pennsylvania, New Hampshire, and Massachusetts enacted similar prover marking statutes for gunpowder stored in caskets, which was essential to using a firearm in the late eighteenth and early nineteenth centuries.  See, 1795 Pa. Laws 26, available at 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (John Bioren 1810);  1820 N.H. Laws, available at Laws of the State of New-Hampshire; with the Constitutions of the United States and of the State Prefixed 277(Isaac Long, Jr. 1830); Mass. Gen. Laws ch. 52, §§ 1-9 (1809), available at Asahel Stearns & Lemuel Shaw, 2 The General Laws of Massachusetts 198-200 (Theron Metcalf ed., 1822).

The manufacture and transportation of gunpowder was also regulated through licensing regimes.  The Colony of Massachusetts prohibited any person from "transport[ing] any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates."  William H.

Whitmore, <u>Colonial Laws of Massachusetts Reprinted from the Edition of 1672, with the Supplements through 1686. Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws from 1649 to 1686</u> 126 (1651 statute). Similarly, in the Colony of Connecticut, no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . [a] license."  15 <u>The Public Records of the Colony of Connecticut</u> 191 (Charles J. Hoadly ed., 1890) (1775 statute). In 1821, the City of Providence, Rhode Island prohibited selling gunpowder within the city "without having a license therefor." <u>The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City</u> 37 (1835).

        The court has also found these citations to be accurate.  According to the Government, these historical regulations are analogous to Section 922(k) because colonial legislatures, like Congress in 1968, "were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands."  This court agrees.

        Historical regulations are "relevantly similar" to Section 922(k) not only in purpose, but also in scope.  <u>Bruen</u> encourages this court to consider how and why the analogous regulations "<u>burden</u> a law-abiding citizen's right to armed self-defense."  142 S. Ct. at 2132-33 (emphasis added).  Here, Founding-era regulations and Section 922(k) merely require an

individual to ensure that the firearm in his or her possession
is properly marked.  The individual right of self-defense is not
burdened by historical prover marks or modern serial numbers
because compliant firearms are readily available and equally
effective as compared to unmarked ones.  Accordingly, the court
finds that the Government has met its burden of establishing
that Section 922(k) as applied to Cherry is consistent with "the
Nation's historical tradition of firearm regulation."  See
Bruen, 142 S. Ct. at 2129-30.

C. Concurrent Sentence Doctrine

As noted above, Cherry challenges his convictions
under Section 922(g)(1) and Section 922(k).  The Government
separately contends that these claims fail under the concurrent
sentence doctrine.  This doctrine gives the court "discretion to
avoid resolution of legal issues affecting less than all of the
counts in an indictment where at least one court will survive
and the sentences on all counts are concurrent."  See United
States v. McKie, 36 V.I. 367, 370, 112 F.3d 626, 628 (3d Cir.
1997);  see also Gardner v. Warden Lewisburg USP, 845 F.3d 99
(3d Cir. 2017).

Here, Cherry does not challenge his conviction for
dealing in firearms without a license, in violation of 18 U.S.C.
§ 922(a)(1)(A).  The sentence on this count runs concurrently to
the sentences on the Section 922(k) counts.  Cherry likewise

does not challenge his sentences for possession and transfer of
a machinegun, in violation of 18 U.S.C. § 922(o), and possession
of an unregistered firearm, in violation of 26 U.S.C.
§§ 5845(a)(6), (b), 5861(d), and 5781.  These sentences run
concurrently to the sentences on the Section 922(g)(1) counts.

The government is correct that Cherry's challenges to
the felon-in-possession and obliterated serial number offenses
fail under the concurrent sentence doctrine.  Thus, even if the
court were incorrect in its analysis of the counts under
Sections 922(g)(1) and (k), Cherry's has no right to relief
because the sentences on the other counts imposed concurrently
have not been challenged.

IV.  Sixth Amendment Analysis

Cherry further asserts that relief is warranted
because his trial counsel provided ineffective assistance in
violation of the Sixth and Fourteenth Amendments.  In Strickland
v. Washington, the Supreme Court established a two-prong test
for analyzing claims of ineffective assistance of counsel.  466
U.S. 668, 687 (1984).  First, the petitioner must show that his
counsel "made errors so serious that counsel was not functioning
as the 'counsel' guaranteed the defendant by the Sixth
Amendment."  Id. at 687.  That is, the petitioner must show that
his counsel's performance "fell below an objective standard of
reasonableness."  Id. at 688.  Second, the petitioner must show

-18-

that counsel's errors caused him prejudice, which the Court defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Among other arguments, Cherry claims he was denied effective assistance of counsel because his trial counsel "advised Petitioner that all the sentences he would receive would run concurrently" if he proceeded to trial and was found guilty. On or about the first day of his trial, Cherry and the Government reached an agreement for Cherry to enter a guilty plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) ("C-Plea") (See Doc. #71). When the court advised counsel that it would not accept a C-Plea, the parties discussed an open plea, that is, a guilty plea without agreement between Cherry and the Government. According to Cherry, his decision to reject an open plea agreement and proceed to trial was predicated on his counsel's promises that he would receive concurrent sentences.

The court held an evidentiary hearing on this issue. At the hearing, his trial counsel, Andrew Schneider, Esq. testified. Although Schneider has limited recollections of the trial which occurred over four years ago, he was emphatic that he never made Cherry any guarantees as to what his sentences would be because sentencing is solely a matter for the judge.

Assistant U.S. Attorney Mark Miller, Esq., who was the
prosecutor, also testified.  During the time that he was present
with Schneider and Cherry attempting to negotiate a non-trial
disposition, he never heard Schneider make such a guarantee to
Cherry.  Miller further stated that if Schneider had done so,
Miller would have immediately corrected him.  In contrast,
Cherry testified that sometime on or about the first day of
trial, Schneider promised him that he would receive concurrent
sentences if he agreed to certain stipulations during the jury
selection process.[4]

      The court finds the testimony of Schneider and Miller
to be credible and the testimony of Cherry not to be credible.
Schneider made no promises to Cherry regarding his sentencing.
Therefore, on this argument, Cherry has not demonstrated that
his trial counsel acted unreasonably.  See Strickland, 466 U.S.
at 687.

      Additionally, Cherry argues that his trial attorney
was ineffective in failing to challenge an allegedly expunged
conviction included in calculating the criminal history category
in his presentence report.  Cherry claims that he suffered
prejudice because his criminal history category was stated as
nine instead of six.  Although that conviction had occurred when

---

4.  Cherry did not explain what he meant by stipulations during
the jury selection process.

he was seventeen years old, he was tried as an adult.  Cherry
did not raise an expunged conviction in his appeal of the
judgment.  Consequently, the court will consider whether
Cherry's failure to challenge the presentence report on appeal
qualifies as ineffective assistance of counsel under <u>Strickland</u>.
<u>See</u> 466 U.S. at 687-88.

        According to Cherry, he "was sentenced to 188-235 with
9 criminal history point [sic], when he should have only had 6
criminal history points that would have put him at 70-87
months."  First, although the court determined that the
sentencing range under the guidelines was 188 to 235 months, he
was sentenced to a lesser term of 180 months' imprisonment.
Second, even if Cherry is correct and the Government's
recommendation based on the disputed prior conviction was in
error, the advisory range under the Sentencing Guidelines would
have been 168 to 210 months.  The court's sentence of 180 months
was within that range.  And third, the court exercised its
discretion and fashioned a sentence, consistent with the factors
in 18 U.S.C. § 3553(a), that was sufficient but not greater than
necessary.

        The court would not have changed its sentence even if
one of his many convictions had been expunged and his criminal
history category had been six instead of nine.  Accordingly,
even if Cherry's counsel erred in not raising the issue on

appeal, Cherry has not established that he was prejudiced. <u>See</u> <u>Strickland</u>, 466 U.S. at 688.

V.   Fifth Amendment Analysis

Cherry further maintains that relief is warranted because he suffered two violations of his Fifth Amendment rights.  First, he argues that he "was not afforded due process in losing his right to bear arms."  This argument is without merit.  Cherry had a full and fair criminal trial.  He was afforded the full array of his Constitutional rights, including due process.

Cherry further argues the multiple Section 922(g)(1) charges "arose out of the same incident, the same act possession [sic] of firearms," and thus, the counts were multiplicitous in violation of the Double Jeopardy Clause.  On the contrary, each separate possession of a firearm or of multiple firearms on separate dates was charged in a separate count.  Setting aside the Section 922(g)(1) counts, the Government prevailed in establishing each element of the remaining offenses, which did not require proof that Cherry was a felon.

VI.  Conclusion

The court has considered Cherry's other arguments for granting habeas relief and finds that they are totally without merit.  Accordingly, his motion under Section 2255 will be denied, and no certificate of appealability will be issued.

-22-
